McCORD, Judge.
This action was brought by appellee under the Federal Safety Appliance Act, Power Brake Law, and the Boiler Inspection Act, 45 U.S.C.A., Sections 8, 9, and 23 and the Federal Employees Liability Act, 45 U.S.C.A., Section 51 et seq. Appellee was injured while working for appellant in an area adjacent to Durham, North Carolina, while working on a train crew that was pushing three railroad cars loaded with sand onto an above grade trestle or chute. The switch engine was operated by Engineer William Perguson. He was sitting on the right side of the engine and Lewis Alexander, a switchman, was standing on the front right steps of the engine. Appellee *86 was riding on the lead end of the lead car and was also on the right side. It was his job to “spot” or place the cars on the chute, and in performing his duties, he was to give signals to the engineer for spotting them in their proper place and to stop the train before it went off the end of the chute.
Appellee testified that when the move commenced, he conveyed a “proceed” signal to the engineer with his lantern; that as the lead car started up on the chute, it was proceeding at a speed of approximately six mph; that when the lead car was about halfway down the chute, it had reduced speed to four mph and he conveyed a slow “proceed” signal; that the train was' decreasing speed very gradually as it proceeded down the chute and when the lead car was approximately 20 feet from the end it was traveling at approximately 2 to 3 mph at which point he gave a “reduced speed” signal; that when the lead car was about IS feet from the end of the chute, he then “signed the engineer down,” which is the stop signal; that he gave this signal some 3 or 4 times with the train going at approximately 2 mph; that he realized the train was not stopping and he commenced to give the “washout” signal or “emergency” signal which was a rapid extension of the “stop” signal; that when he realized the train was not going to stop, he jumped just as the lead car contacted the butt block. It was his contention at the trial that although he had given the proper signals in a timely fashion, the engine, due to defective brakes, was unable to stop before the lead car struck the butt block on the end of the chute.
Appellant, on the other hand, contended that the lead car struck the butt block and went past the end of the rails because of appellee’s failure to give the necessary and proper signals to the engineer; that appel-lee waited until too late to give a slow signal and then gave a simultaneous emergency stop signal when the lead car was to close to the end of the chute to be stopped under any conditions.
The engineer, a resident of Raleigh, North Carolina, did not come to Florida for the trial but his deposition which was previously taken on November 29, 1972, in Raleigh by the attorney for appellee was published in evidence by appellant. His testimony supported appellant’s contentions relative to the lack of signals given by ap-pellee. He stated that he had his eyes on appellee the entire time the movement was being made and the only signals he received from appellee were a “highball” signal when they got ready to go on the chute and a continuous “come ahead” signal until he received a “hold up and washout that was so close together that I shoved off and put it in emergency.”
Switchman Alexander in his deposition testified that he was not relaying signals because engineer Perguson could see appel-lee as well as Alexander could; that he did not remember whether or not appellee was giving any signals prior to his giving a slow signal and immediately thereafter an emergency stop signal.
At the trial on December 15, 1972, appel-lee took the stand in rebuttal to Perguson’s deposition testimony. He testified, over objection of appellant, that on Sunday, December 3, 1973, (twelve days previously and four days after the deposition was taken) Perguson left a telephone call for him while he was at church. Appellee testified as follows regarding the telephone conversation between him" and Perguson when he returned the call:
“A . He says, T haven’t been about to sleep since Wednesday night.’ And this was Sunday.
“ ‘My conscience has been bothering me, because I told three or four lies.’
“Q And what did he tell you about that?
“A Onliest one he really elaborated on was the signals, and that he knew me and Louis both were giving signals.
*87 “Q All right, sir. Now, did he mention anything in regard to himself and the railroad ?
“A Yes, he stated that they had just kept after him until he told them what they wanted to hear.
“Q All right, sir. Now did he go into any more of the statements that he said were not true other than the one about the signals ?
“A No, that’s the onliest one he got into.”
He further testified that he advised his attorney of the conversation immediately; that Perguson wanted him to call his (ap-pellee’s) counsel and he did.
The question before us for review is whether or not the admitting of the above rebuttal testimony was error— whether or not it was admissible in the absence of a foundation having been laid for it in testimony of witness Perguson. The trial court held that the rebuttal testimony went to the animus of the witness rather than impeachment and that no predicate was necessary, relying upon Alford v. State, 47 Fla. 1, 36 So. 436 (1904), and other authority. We have no quarrel with the proposition of law that a foundation is unnecessary for rebuttal testimony showing only animus (motive, interest, bias), and we cannot agree that this testimony falls in that category. While it shows animus, it goes considerably beyond animus and is direct impeachment of Perguson’s previous testimony by hearsay. The two questions which were erroneously ruled inadmissible in the absence of a previous predicate by the trial court in Alford went solely to animus and not to impeachment. In the case sub judice, the questioned testimony goes to both. The fact that a foundation need not be laid for presenting testimony as to animus of a witness does not dispense with the necessity that a foundation be laid to render impeaching testimony admissible. It is also noted that in offering his rebuttal testimony, counsel for appellee stated it was being offered for impeachment. Animus was not mentioned.
In Davis v. Ivey, 93 Fla. 387, 112 So. 264, cert. den., 275 U.S. 526, 48 S.Ct. 19, 72 L.Ed. 407, the Florida Supreme Court stated as follows:
“We do not mean to say evidence of the interest, bias, prejudice, or motives of a witness can only be shown after a predicate laid by cross-examination of the witness as to the facts sought to be proven; but, if the purpose of such evidence is to impeach the adverse witness, then it must be based upon such a predicate, and the evidence offered must be of that character which is the best evidence of the facts sought to be proven. If the evidence is offered only for the purpose of showing interest of a witness and the best evidence of such fact is offered at the proper time and place of the trial, it would be error for the court to refuse to admit such evidence.” (Emphasis supplied)
In United States v. Hayutin, 398 F.2d 944 (1968) the United States Court of Appeals, Second Circuit, had the following to say regarding testimony offered to show animus which is also impeaching:
“Counsel argued then and argues now that the testimony was not sought to impeach the witnesses, but to show a state of mind, of bias or hostility, and that such out-of-court statements were relevant on that issue, irrespective of the testimony given on direct examination by the Government witnesses, and thus admissible without reference to their testimony, even if it contradicted it. The general rule is that a prior self-contradictory statement, where used to discredit a witness, is required to be asked of the witness first, in order to give him an opportunity to deny or explain it. The statements sought to be brought out by defense witnesses fell clearly within that rule and on that ground were properly excludable. The rule is not so clear where a ‘supposed utterance indicating *88 bias’ is sought to be used to show bias or prejudice, although Professor Wigmore urges that the same reasons of fairness dictate that the witness be given the opportunity to deny or explain the utterances. (3 Wigmore on Evidence, 3rd ed., Sec. 953; Accord United States v. White, 225 F.Supp. 514, 519-521 (1963, U.S.D.C.); Smith v. United States, 283 F.2d 16, 87 A.L.R.2d 394 (6th Cir., 1960), cert. den. 365 U.S. 847, 81 S.Ct. 808, 5 L.Ed.2d 811 (1961).) No case has been cited where the rule was dispensed with where the statement showing bias or prejudice was also self-contradictory of the very testimony being given by the witness.”
Having concluded that this rebuttal testimony showing animus was not admissible without predicate because it also shows an inconsistent statement of the witness, we turn now to the next question. Does the fact that the inconsistent statement was a statement made subsequent to the taking of the deposition rather than prior thereto render it admissible without predicate ?
The law of Florida is clear that a predicate must be laid before a prior inconsistent statement is admissible. Section 90.10, Florida Statutes, provides as follows :
“If a witness, upon cross examination as to a former statement made by him relative to the subject matter of the cause and inconsistent with his present testimony,' does not distinctly admit that he has made such statement, proof may be given that he did in fact make it; but before such proof can be given, the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to witness, and he must be asked whether or not he made such statements.”
In construing the above statute, the Florida Supreme Court has on two occasions stated that the failure to lay a proper predicate for impeaching testimony converts otherwise admissible testimony into hearsay. See Andrews v. State, Fla., 261 So.2d 497 and Morasso v. State, 74 Fla. 269, 76 So. 777. It would be no less hearsay if it is a subsequent inconsistent statement than if it is a prior one.
In an early case before the U. S. Supreme Court, Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409, the court stated as follows:
“The authorities, except in some of the New England states, are almost unanimous to the effect that, before a witness can be impeached by proof that he has made statements contradicting or differing from the testimony given by him upon the stand, a foundation must be laid by interrogating the witness himself as to whether he has ever made such statements. Justice to the witness himself requires not only that he should be asked whether he had ever made such statements, but his attention should be called to the particular statement proposed to be proven, and he should be asked whether, at such a time and place, he had made that statement to the witness whose testimony is about to be introduced. This method of impeachment was approved by this court in Conrad v. Griffey, 16 How. 38, [14 L.Ed. 835,] wherein the rule is stated to be ‘founded upon common sense, and is essential to protect the character of the witness. His memory is refreshed by the necessary inquiries, which enable him to explain the statements referred to, and show that they were made under a mistake, or that there was no discrepancy between them and his testimony.’ In this case the deposition of a witness taken in the cause was sought to be impeached by a letter of the witness written before his deposition, and addressed to the plaintiff, with an affidavit annexed by him of the same date. The general rule is also approved in The Charles Morgan, 115 U.S. 69, 77, 5 S.Ct. 1172, [29 L.Ed. 316,] although in that particular case it was held that proper foundation had been laid for *89 the introduction of the evidence. The principle was also approved in Railway Co. v. Artery, 137 U.S. 507, 11 S.Ct. 129 [,34 L.Ed. 747],
It is insisted, however, that the rule ceases to apply where the witness has died since his testimony was given, and the contradictory statements were either made subsequent to the giving of his testimony, or, if made before, were not known to counsel at the time he was examined; that, if such contradictory statements be not admitted, the party affected by his testimony ’is practically at the mercy of the witness; that the rule requiring a foundation to be laid is, after all, only a matter of form, and ought not to be enforced where it works a manifest hardship upon the party seeking to impeach the witness. The authorities, however, do not recognize this distinction.”
ifc jjt :}s sfc sji %
“The cases in the state courts are by no means numerous, but these courts, so far as they have spoken upon the subject, are unanimous in holding that the fact that the attendance of the witness cannot be procured, or even that the witness himself is dead, does not dispense with the necessity of laying the proper foundation. Thus in Stacy v. Graham, 14 N.Y. 492, 499, counsel, while conceding the rule, relied upon two circumstances to relieve the case from its influence. The first was that the attendance of the witness could not be procured at the time of the trial; and the second, that the declarations and statements offered to be proved were made after the witness had testified, and were a direct admission that he had sworn falsely. It was held that, if the statements came to the knowledge of counsel afterwards, and before the trial, it was his duty to apply for a commission, or move a postponement, until the evidence could be procured. ‘The mere absence of the witness,’ said the court, ‘has never been considered a reason for allowing his un-sworn statements to be proved in order to affect his credibility.’ ”
If testimony of contradictory statements made by a deceased witness subsequent to his testimony are not admissible, there is stronger reason for not admitting such testimony as to a living witness. Here, the inconsistent statements were allegedly made twelve days previously. While the witness was beyond the jurisdiction of the court, no effort was made by appellee, as far as is shown by the record, to either obtain the presence of the witness at the trial or take his additional deposition. The impeaching testimony was not admissible without a foundation being laid for it.
We have also considered appel-lee’s contention that the impeaching testimony was admissible as a declaration against interest but find such to be without merit. Since this testimony goes to the heart of the case, we are unable to agree with appellee’s additional contention that its admission, if error, was harmless error.
Reversed and remanded for a new trial.
DREW, E. HARRIS, (Retired) Associate Judge, concurs, and BOYER, Acting C. J., dissents.